NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted April 11, 2022[*]
Decided May 16, 2022

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 21-1193

| | |
|---|---|
| TRAVIS D. WILLIAMS, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 1:19-cv-01174-WCG |
| JAMIE ADAMS, et al., *Defendants-Appellees*. | William C. Griesbach, *Judge*. |

## O R D E R

Travis Williams, a former Wisconsin inmate, appeals the entry of summary judgment on his claims that, for two years, prison health services staff provided constitutionally deficient care in treating his myriad conditions and retaliated against him when he complained. The undisputed facts in the record, however, reveal that the

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

defendants provided robust and varied treatment for Williams's medical conditions. Because Williams has not presented evidence suggesting that any defendant recklessly disregarded his medical conditions or retaliated against him for complaining, we affirm.

From 2017 to 2019, while Williams was incarcerated at the Wisconsin Secure Program Facility, he saw Sandra McArdle, a nurse practitioner, as his primary care provider. McArdle saw him one to two times per week during this time, treating him for conditions including testicular cysts, breathing and sleeping problems, a disfigured foot, problems with his ears, and chronic pain from osteoarthritis, joint disease, and nerve damage. Williams also interacted with two health services managers, Jamie Adams and Jolinda Waterman, about his medical treatment.

McArdle first treated Williams's testicular cysts in 2017. Although an ultrasound in 2016 revealed several cysts, an offsite urologist recommended against surgical intervention. So, over the next year and a half, following the advice of urologists, McArdle ordered lidocaine cream and a jockstrap to mitigate Williams's scrotal pain, and ordered further ultrasounds. McArdle also arranged for repeated follow-up appointments with the urologists. In May 2018, after these interventions failed to control Williams's pain, a urologist recommended Williams for testicular surgery. McArdle ordered the surgery, but it was twice postponed due to circumstances outside of her control. First, the surgery was rescheduled because Williams was taking blood-thinning medication for an unrelated condition, and the surgeon recommended waiting to perform it until Williams stopped taking the medication. Later, it was again rescheduled because Williams refused to participate in the necessary lab work and blood draw. McArdle attempted to reschedule the surgery a third time in July 2019, but administrators at the prison denied her request for approval of the procedure.

McArdle also was involved in the treatment of Williams's breathing issues, for which he was prescribed a CPAP machine. McArdle discontinued the machine in November 2018 because Williams had not used it for the recommended four hours a day on any of the last 30 days. After a consultation with a respiratory therapist, however, McArdle renewed Williams's CPAP machine, and it was returned to him 15 days after the discontinuation.

Williams also saw McArdle during this time for his chronic pain. Williams had several appointments at an offsite pain clinic, and in June 2017, McArdle started Williams on a pain medication called duloxetine. McArdle increased the dosage to 90 mg over two months. Later, someone at the prison (not McArdle) began giving

Williams 120 mg by mistake. When this mistake was discovered, Williams did not receive any medication for over two weeks. Williams says he suffered serious withdrawal effects as a result. After the medication was resumed, however, Williams complained that it was ineffective in treating his pain. He requested to be weaned off the duloxetine and given something else. Five days later, complying with Williams's request, McArdle wrote a prescription to taper Williams off the duloxetine and eventually to discontinue it. She then prescribed Williams a different pain medication. In May 2019, corrections officers found a stash of medications, including various pain medications, in Williams's cell. Because he appeared to be hoarding medications, Williams received a conduct report and was found guilty of medication misuse.

McArdle treated several of Williams's other conditions as well, but not always in the manner he preferred. For example, she ordered him orthotic shoes to fit his disfigured foot, and she referred him for several appointments with offsite podiatrists. As a result, Williams received pain-relieving injections in his heels, custom orthotics, and physical therapy. McArdle did not, however, refer Williams for foot surgery. McArdle also treated Williams's chronic shoulder pain, including by sending him to several orthopedists, which resulted in cortisone shots. Williams also suffered from chronic ear pain and discomfort. Again, McArdle followed the advice of several specialists. She prescribed creams and drops, had Williams's ears flushed, and eventually approved hearing aids.

Throughout this period, Williams filed numerous health services requests— sometimes as often as twice a day—communicating his discontent with his treatment and often making insulting statements to the medical staff. In one request, for example, he wrote, "You got to be the most stupid person ever created by God." Despite Williams's often abusive language, McArdle continued to evaluate him one to two times per week, referred him for offsite consultations with specialists, and managed his pain medications.

The nursing staff forwarded some of Williams's requests to the health services managers, Adams and Waterman, who worked in a primarily administrative role. As health services managers, Adams and Waterman were responsible for monitoring care plans, preparing reports, and liaising with other units at the prison and outside providers. They did not evaluate, treat, or prescribe medications for inmates, nor did they make referrals, schedule offsite appointments, or approve treatment recommendations from outside providers. Waterman received some of Williams's requests complaining about the discontinuation of his CPAP machine, so she contacted

the advanced-care provider, eventually resulting in the machine's renewal and return to Williams. Williams also wrote letters to Adams communicating his belief that McArdle was not providing adequate care. Adams referred to Williams's medical records and consulted with medical providers to investigate each issue, and he responded to Williams to explain the reasons for the discontinuation of certain medications and denial of appointments with some offsite specialists, among his other complaints. Adams also met with Williams in person to discuss his concerns.

Williams then sued Adams, Waterman, and McArdle under 42 U.S.C. § 1983 for violating his rights under the Eighth and First Amendments. He argued that Adams and Waterman were deliberately indifferent to his medical conditions, alleging that they failed to take corrective action when Williams informed them about McArdle's alleged mistreatment. Williams also alleged that McArdle was deliberately indifferent for denying effective treatment for his numerous medical conditions. And he argued that McArdle had violated his rights under the First Amendment. Williams says McArdle retaliated against him by refusing treatment and canceling his pain medication after he complained about her.

During discovery, Williams moved under Federal Rule of Evidence 706 for the appointment of an expert witness, contending that as a non-medical professional, he could not "state with clarity" why McArdle's treatments were ineffective. The court denied Williams's motion, explaining that Rule 706 provided for a court-appointed, neutral expert to help sort through conflicting evidence but not to benefit a particular party's case.

The district court later granted summary judgment for Adams, Waterman, and McArdle. Regarding the claims against Adams and Waterman, it ruled that no reasonable jury could conclude that they were deliberately indifferent to Williams's health because they reasonably investigated his complaints and properly deferred to his providers' medical judgment. As for McArdle, the court held no reasonable jury could conclude, based on the record, that she was deliberately indifferent because she attempted repeatedly to treat Williams's myriad conditions, often implementing treatment strategies recommended by specialists. As to the First Amendment claim, the court found that Williams had not produced evidence that any of McArdle's treatment decisions were motivated by his complaints.

On appeal, Williams first argues that the district court wrongly entered summary judgment for Adams and Waterman, who, he argues, turned a blind eye to his complaints about the inadequate care that McArdle was providing. Williams argues

that they were deliberately indifferent to his health by refusing to arrange for the treatments and medications he believed were necessary to alleviate his chronic pain and other conditions.

The district court correctly granted summary judgment to Adams and Waterman. Williams produced no evidence to persuade a reasonable jury that by failing to respond more proactively to his numerous complaints, the health services managers knew of and recklessly disregarded a serious medical need. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). To the contrary, the undisputed facts show that Adams and Waterman responded to each of Williams's requests, consulted with medical providers to investigate his concerns, and met with him in person to address his complaints. Moreover, as health services managers, Adams and Waterman worked in administrative roles and had no authority to order specific treatment for Williams. Although Williams asserts that their sustained inaction resulted in the denial of necessary care, they were presumptively entitled as administrators to defer to the professional judgment of medical staff. *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021).

Williams next challenges the district court's entry of summary judgment for McArdle on his deliberate-indifference claim. He argues that the court erred by overlooking evidence that McArdle rendered treatments and medications to Williams despite knowing them to be ineffective. He says the court failed to acknowledge evidence that McArdle discontinued his duloxetine medication (despite his request for a higher dose), delayed his approval for testicular surgery, discontinued his CPAP machine, and improperly treated his ear, foot, and joint pain.

Williams has not furnished evidence sufficient to persuade a reasonable jury that McArdle recklessly disregarded his conditions. *See Lewis v. McLean*, 864 F.3d 556, 562–63 (7th Cir. 2017). In evaluating whether McArdle was deliberately indifferent to Williams's health, we examine the totality of his medical care. *See Petties*, 836 F.3d at 728. The undisputed facts show that McArdle strived at length to treat Williams's numerous conditions. She evaluated him multiple times a week, referred him to specialists, referred him for testicular surgery, ordered him a jock strap and orthotics, and prescribed various medications for his pain.

No reasonable jury could conclude that McArdle was deliberately indifferent to his medical conditions when she discontinued his pain medication, removed his CPAP, or referred him for surgery. Regarding the pain medication, the record shows that McArdle discontinued the duloxetine prescription only after Williams reported that the

medication was no longer effective. Williams now says that instead of terminating the duloxetine prescription, McArdle should have increased his dose. Although Williams may have preferred that McArdle prescribe a higher dose of the medicine rather than discontinue it, his disagreement with his provider about his medication is insufficient to establish deliberate indifference. *See Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014). Moreover, the discovery of medications stashed in Williams's cell reflects that he had a history of failing to take medications as prescribed by McArdle. In any event, McArdle weaned Williams off the duloxetine at his request in order to prescribe a different pain medication that might be more effective.

Nor could a reasonable jury conclude that McArdle was indifferent to Williams's need for testicular surgery and the CPAP machine. The record shows she referred him for surgery once a urologist recommended it, was not involved in its twice being postponed (which occurred because of risks from Williams's medications and his later refusal to take a blood test), and was not part of the administrative group that eventually denied the surgery in 2019. McArdle followed the advice of offsite specialists in prescribing several treatments for Williams's testicular pain before surgery was recommended, including lidocaine cream and a jockstrap. She discontinued Williams's CPAP machine because he failed to use it as prescribed, not because she was indifferent to his need for it. In fact, the undisputed evidence shows that as soon as a specialist instructed McArdle that Williams needed the machine, she reinstated it.

McArdle's robust treatment of Williams's other medical concerns, including his foot, ear, and joint pain, reflects that she was not deliberately indifferent to those conditions, either. When Williams complained of foot pain, McArdle referred him to a podiatrist and ordered orthotics in Williams's requested size. In response to his complaints of shoulder and joint pain, she ordered appointments with an offsite orthopedic specialist who performed x-rays and gave Williams cortisone shots in his shoulders. In each instance, McArdle properly sought the medical advice of specialists and approved procedures that they believed would treat Williams's conditions most effectively. *See Petties*, 836 F.3d at 729 (taking instructions from a specialist is within the bounds of competent medical judgment).

Williams also argues for the first time on appeal that McArdle was deliberately indifferent to his cardiac issues. He asserts that her discontinuation of his medication to prevent blood clots resulted in chest pain and a visit to the emergency room. But because Williams did not argue before the district court that McArdle was deliberately indifferent to his chest pain or cardiac issues, those arguments are waived on appeal.

*Duncan Place Owners Ass'n v. Danze, Inc.*, 927 F.3d 970, 974 (7th Cir. 2019). In any event, Williams presented no evidence that McArdle was responsible for discontinuing his blood-clot medication. The evidence also shows that McArdle responded appropriately to Williams's complaints of chest pain by referring him to a hematologist and a cardiologist, and she followed these specialists' recommendations to refer Williams for a "tilt table" test and other stress tests. *See Petties*, 836 F.3d at 729.

Williams next challenges the entry of summary judgment for McArdle on his First Amendment retaliation claim. To defeat summary judgment, Williams needed to offer evidence that (1) he was engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter future First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in McArdle's decision to take the alleged retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Williams failed to point to evidence supporting a causal link between McArdle's decision to discontinue his duloxetine prescription or her other treatment decisions and his complaints about her care. *See Zimmerman v. Bornick*, 25 F.4th 491, 492 (7th Cir. 2022). Instead, he supports his claim of causation with only speculation. The district court properly entered summary judgment in McArdle's favor.

Finally, Williams challenges the district court's denial of his motion for court appointment of an expert witness, arguing that the court improperly disregarded the fact that Williams is unfamiliar with the "highly technical language" that would shed light on the defendants' treatment of his medical conditions. We review for an abuse of discretion the court's denial of Williams's motion under Federal Rule of Evidence 706. *Giles v. Godinez*, 914 F.3d 1040, 1053–54 (7th Cir. 2019). This court has previously found some circumstances in which a district court should consider appointing a neutral expert to help the court understand important evidence, even when the expert's opinion incidentally benefits a party. *See Rowe v. Gibson*, 798 F.3d 622, 632 (7th Cir. 2015), rehearing en banc denied by equally divided court, 2015 WL 10767326 (7th Cir. 2015). But that decision remains firmly within a district court's broad discretion, *see Giles*, 914 F.3d at 1053, and a court should ensure that the purpose of the expert's opinion is to aid the court, not the party seeking appointment. *See Ledford v. Sullivan*, 105 F.3d 354, 358–59 (7th Cir. 1997) (Rule 706 expert may be appointed to "assist the trier-of-fact to understand the evidence or decide a fact in issue.").[1] Here, the court appropriately

---

[1] When a party seeks a court-appointed expert to satisfy a deficiency in the party's case, caution is especially warranted. The court may do so in an extraordinary

exercised its discretion in determining that a court-appointed expert was unnecessary, because the evidence in Williams's medical record was not so complex that it could not be understood by a layperson. *See id.*

For the first time on appeal, Williams says that, in addition to appointing an expert, the district court also should have appointed him counsel. But Williams did not move for counsel in the district court, so any argument along those lines is waived. *See Johnson v. Dominguez*, 5 F.4th 818, 826 (7th Cir. 2021).

AFFIRMED

---

case, as in *Rowe*, 798 F.3d at 632, but the court should consider carefully whether appointing such an expert may undermine the court's neutrality. Courts should also consider how the expert will be compensated and the fairness, or lack of fairness, in ordering one party to bear the cost of compensating an expert whose opinion helps the other party build her case. *See Ledford*, 105 F.3d at 360–61.