In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-2674

TYRONE PETTIES,

*Plaintiff-Appellant,*

*v.*

IMHOTEP CARTER and SALEH OBAISI,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 9353 — **George M. Marovich**, *Judge.*

ARGUED APRIL 28, 2015

REARGUED EN BANC DECEMBER 1, 2015

DECIDED AUGUST 23, 2016, AMENDED AUGUST 25, 2016

Before WOOD, *Chief Judge,* and POSNER, FLAUM,
EASTERBROOK, KANNE, ROVNER, WILLIAMS, SYKES, and
HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Tyrone Petties suffered a debilitat-
ing rupture in his Achilles tendon, which caused him extreme

pain and impeded his mobility over the course of three years. He brought a lawsuit under 42 U.S.C. § 1983 against his doctors at Stateville Correctional Facility, alleging they failed to alleviate his suffering and to enable his recovery from the injury. We heard this case *en banc* to clarify when a doctor's rationale for his treatment decisions supports a triable issue as to whether that doctor acted with deliberate indifference under the Eighth Amendment. We conclude that even if a doctor denies knowing that he was exposing a plaintiff to a substantial risk of serious harm, evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment is sufficient to survive summary judgment. Because we find that Petties has produced sufficient evidence for a jury to conclude that the doctors knew the care they were providing was insufficient, we reverse the district court's grant of summary judgment to the defendants.

## I. BACKGROUND

Petties was walking up the stairs of his cell house at Stateville in January 2012 when he heard a loud pop and felt excruciating pain and weakness in his left Achilles tendon. It was not the first time he had suffered such an injury. In 2010 he suffered a partial rupture in his right Achilles tendon at the prison which had not fully healed.

An Achilles tendon rupture is a tear in the tendon which impedes the ability of the foot to point downward, causing pain and limiting mobility. Walking around on a ruptured tendon exacerbates the injury, increasing the gap between the torn edges of a tendon because of the way that muscles contract in the foot and calf. Immobilizing the injured foot prevents stretching of the tear and allows the torn edges of the tendon to sit together, and scar tissue to form, rejoining the

edges. When an Achilles rupture is not immobilized, the stretching apart of the torn tendon edges when the injured foot hits the ground causes severe pain and weakness.

Petties went to Stateville's health clinic and eventually saw Dr. Imhotep Carter, the medical director of Stateville (though his actual employer was Wexford Health Sources, a private contractor of medical services to correctional facilities). Before Petties, Dr. Carter had seen approximately ten Achilles tendon ruptures in his twenty-year career. As the prison's medical director, Dr. Carter was in charge of implementing Wexford's medical policies and procedures, among which was a specific treatment protocol for patients with ruptured Achilles tendons. The protocol advised that patients receive a splint, crutches, and antibiotics if there were lacerations to the site of injury, and then be sent to a specialist for further treatment.

Dr. Carter's notes reflect that he thought Petties had an Achilles tendon rupture, and that he followed some of Wexford's protocol, but not all of it. He gave Petties crutches, ice, and Vicodin. He also authorized one week of "lay-in" meals, which meant that Petties did not have to walk to the cafeteria, but could eat in his cell. Finally, he referred Petties to a specialist, but that appointment did not happen for almost six weeks. In the meantime, Dr. Carter did not provide Petties with a splint, boot, cast, or other device that would immobilize his foot. About a month later, after Petties reported to the infirmary that his tendon was "killing him" and keeping him from climbing stairs, Petties saw Dr. Carter again and received a renewed prescription for crutches, pain medication, lay-in meals, and assignment to a lower bunk to keep pressure off his foot. But he still did not receive a splint.

In March 2012, Petties had an MRI taken which showed an Achilles tendon rupture. There was a gap between the torn ends of the tendon that measured approximately 4.7 centimeters. About a week later, Petties met with Dr. Anuj Puppala, an orthopedic specialist, who noted that the lack of "any sort of cast" was potentially creating the gapping at the tendon rupture site. He recommended an orthopedic boot to prevent further gapping and to alleviate pain, and gave one to Petties. Finally, he thought that surgery might be necessary due to the gapping, and referred Petties to an ankle specialist. When Petties returned to Stateville, Dr. Carter authorized use of the boot, along with crutches, ice, and assignment to a lower bunk. Petties asserts that Dr. Carter said he would not order surgery because it was too costly.

In July 2012, Petties finally saw an ankle specialist, Dr. Samuel Chmell, who ordered a second MRI after noting weakness in Petties's ankle. Dr. Chmell also ordered physical therapy, gentle stretching exercises, and follow-up treatment. In August 2012, Dr. Carter was replaced as the medical director of Stateville by Dr. Saleh Obaisi, another Wexford employee. Dr. Obaisi approved the order for a second MRI, but did not authorize physical therapy. According to Petties, he also said that surgery was too expensive.

That September, Petties had his second MRI, which showed a partial tear in his tendon, indicating some healing. But he continued to complain of pain, and Dr. Obaisi gave him Tylenol, approved a low bunk permit, and continued his use of the boot. Dr. Obaisi renewed the low bunk permit and use of the boot in November, and again the following June. Petties experienced pain, soreness and stiffness as late as March 2014, over two years after the injury.

In November 2012, Petties filed a lawsuit under 42 U.S.C. § 1983 against Dr. Carter and Dr. Obaisi for deliberate indifference in violation of the Eighth Amendment. The district court granted summary judgment to Dr. Carter and Dr. Obaisi. Petties appeals.

## II. ANALYSIS

We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Petties, and drawing all inferences in his favor. *Pagal v. TIN Inc.*, 695 F.3d 622, 624 (7th Cir. 2012).

"The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotation marks omitted). Every claim by a prisoner that he has not received adequate medical treatment is not a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). But the Eighth Amendment safeguards the prisoner against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Id*. at 103.[1] To determine if the Eighth Amendment has

---

[1] Our dissenting colleagues suggest that *Estelle* shields doctors from liability if they provide palliative care to prisoners. Unless a doctor refuses to provide care or leaves the inmate worse off than before, the dissent would have us draw the legal conclusion that the prison doctor did not intentionally disregard a prisoner's serious medical needs. But *Estelle* explicitly held that a violation of the Eighth Amendment can be established whether "the indifference is manifested by prison doctors *in their response to the prisoner's needs or* by prison guards in intentionally denying or delaying access to medical care *or* intentionally interfering with the treatment once prescribed. *Regardless of how evidenced*, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." 429 U.S. 97, 104–05 (emphasis added). The dissent collapses these distinct avenues to proving deliberate indifference into one—*any* response

been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition. *Farmer*, 511 U.S. at 834; *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010).

In evaluating an Eighth Amendment claim, we start by determining if the medical condition the plaintiff suffered was objectively serious. *Farmer*, 511 U.S. at 834; *see also Walker v. Peters*, 233 F.3d 494, 498 (7th Cir. 2000). Here, the parties agree that an Achilles tendon rupture is an objectively serious condition, but they dispute whether in responding to the rupture, the defendants acted with deliberate indifference.

To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (citing *Farmer*, 511 U.S. at 842). For a prison official's acts or omissions to constitute deliberate indifference, a plaintiff does not need to show that the official intended harm or believed that harm would occur. *Id.* at 992. But showing mere negligence is not enough. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) ("Deliberate indifference is not medical malpractice."). Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it *should* be known—is insufficient to make out a claim. *Farmer*, 511 U.S. at 836–38. Instead, the Supreme Court has instructed us that a

---

by a physician, so long as it is not harmful, satisfies the Eighth Amendment. But that is not the holding of *Estelle,* and we decline to make such a leap here.

plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm. *Id.* at 837. Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety. *Id*. at 844.

The difficulty is that except in the most egregious cases, plaintiffs generally lack direct evidence of actual knowledge. Rarely if ever will an official declare, "I knew this would probably harm you, and I did it anyway!" Most cases turn on circumstantial evidence, often originating in a doctor's failure to conform to basic standards of care. While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference. *Estelle*, 429 U.S. at 106. But blatant disregard for medical standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances. And that is the question we are faced with today—how bad does an inmate's care have to be to create a reasonable inference that a doctor did not just slip up, but was aware of, and disregarded, a substantial risk of harm? We must determine what kind of evidence is adequate for a jury to draw a reasonable inference that a prison official acted with deliberate indifference.

We start this inquiry by examining our existing precedent. As an initial matter, we look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs. *Cavalieri v. Shephard*, 321 F.3d 616, 625–26 (7th Cir. 2003). We have identified several circumstances that can be enough to show deliberate indifference. First, and most obvious, is a prison official's decision to ignore a request for medical assistance. *Estelle*, 429

U.S. at 104–05. But an inmate is not required to show that he was literally ignored by prison staff to demonstrate deliberate indifference. *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000). If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it. *Norfleet v. Webster,* 439 F.3d 392, 396 (7th Cir. 2006); *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996).

In the medical context, of course, obviousness of a risk can be obscured by the need for specialized expertise to understand the various implications of a particular course of treatment. So we have found in those cases where unnecessary risk may be imperceptible to a lay person that a medical professional's treatment decision must be "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Cole*, 94 F.3d at 261–62; *see also Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, no minimally competent professional would have so responded under those circumstances."). By contrast, evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim. *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996).

Even among the medical community, the permissible bounds of competent medical judgment are not always clear, particularly because "it is implicit in the professional judgment standard itself…that inmate medical care decisions

must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Roe v. Elyea,* 631 F.3d 843, 859 (7th Cir. 2011). So it can be challenging to draw a line between an acceptable difference of opinion (especially because even admitted medical malpractice does not automatically give rise to a constitutional violation), and an action that reflects sub-minimal competence[2] and crosses the threshold into deliberate indifference. One hint of such a departure is when a doctor refuses to take instructions from a specialist. *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011); *Jones v. Simek*, 193 F.3d 485, 490 (7th Cir. 1999). Another is when he or she fails to follow an existing protocol. "While published requirements for health care do not create constitutional rights, such protocols certainly provide circumstantial evidence that a prison health care gatekeeper knew of a substantial risk of serious harm." *Mata v. Saiz*, 427 F.3d 745, 757 (10th Cir. 2005).

Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective. *Walker,* 233 F.3d at 499 (citations omitted). For example, if

---

[2] Our colleagues take issue with our repeated references to the competence of medical professionals, suggesting we are injecting state malpractice standards into the constitutional test for deliberate indifference. But we do not suggest that incompetent doctors violate the Constitution. We simply note that a medical decision that has no support in the medical community, along with a suspect rationale provided for making it, can support a jury finding that a doctor *knew* his decision created a serious risk to an inmate's health. To hold otherwise would mean that *any* treatment decision a doctor made, regardless of whether it had any scientific basis, would be immune from scrutiny.

knowing a patient faces a serious risk of appendicitis, the prison official gives the patient an aspirin and sends him back to his cell, a jury could find deliberate indifference even though the prisoner received some treatment. *Sherrod,* 223 F.3d at 612; *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids over three years created material fact issue of deliberate indifference); *Snipes v. Detella*, 95 F.3d 586, 592 (7th Cir. 1996) (holding Eighth Amendment claim may exist if medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition); *Kelley v. McGinnis*, 899 F.2d 612, 616–17 (7th Cir. 1990) (per curiam).

If a prison doctor chooses an "easier and less efficacious treatment" without exercising professional judgment, such a decision can also constitute deliberate indifference. *Estelle,* 429 U.S. at 104 n.10; *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015) (material fact issue whether provision of only painkillers and ice to an inmate suffering from suspected fracture constituted deliberate indifference). While the cost of treatment is a factor in determining what constitutes adequate, minimum-level care, medical personnel cannot simply resort to an easier course of treatment that they know is ineffective. *Johnson,* 433 F.3d at 1013; *Roe*, 631 F.3d at 863 (although administrative convenience and cost may be permissible factors for correctional systems to consider, the Constitution is violated when they are considered to the exclusion of reasonable medical judgment about inmate health).

Yet another type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest. *Grieveson v. Anderson*,

538 F.3d 763, 779 (7th Cir. 2008) (guards could be liable for delaying treatment of broken nose for a day and half); *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007) (a plaintiff who painfully dislocated his finger and was needlessly denied treatment for two days stated a claim for deliberate indifference). Of course, delays are common in the prison setting with limited resources, and whether the length of a delay is tolerable depends on the seriousness of the condition and the ease of providing treatment. *Compare Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (given extreme ease of supplying sufferer of gastro-esophageal reflux disease with over-the-counter pills, failing to do so for two months created fact question over deliberate indifference), *Berry*, 604 F.3d at 441 (finding refusal to refer patient to a dentist actionable because "a basic dental examination is not an expensive or unconventional treatment, nor is it esoteric or experimental") (internal quotation marks omitted), *Arnett*, 658 F.3d at 752 (medical personnel could not stand idly by for more than ten months while patient's rheumatoid arthritis progressively worsened), *Simek*, 193 F.3d at 490 (viable claim where doctor delayed scheduling appointment with specialist and then failed to follow specialist's advice, while inmate's condition worsened), *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009) (state employees could be liable for four-day delay where prisoner complained his intravenous therapy was causing him pain), *with Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (no valid claim for six-day delay in treating a mild cyst infection). To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (delay actionable where medical

records showed it unnecessarily prolonged plaintiff's pain and high blood pressure); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (hours of needless suffering can constitute harm).

These cases bear a few notable commonalities. Most of them involve treatment, sometimes over an extended period of time. But repeatedly, we have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment. Rather, the context surrounding a doctor's treatment decision can sometimes override his claimed ignorance of the risks stemming from that decision. When a doctor says he did not realize his treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the doctor *did* know. Those context clues might include the existence of documents the doctor regularly consulted which advised against his course of treatment, evidence that the patient repeatedly complained of enduring pain with no modifications in care, inexplicable delays or departures from common medical standards, or of course, the doctor's own testimony that indicates knowledge of necessary treatment he failed to provide. While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a doctor's claim he did not know any better sufficient to immunize him from liability in every circumstance. Otherwise, prison doctors would get a free pass to ignore prisoners' medical needs by hiding behind the precedent that medical malpractice is not actionable under the Eighth Amendment. Prisoners are not entitled to state-of-the art medical treatment. But where evidence exists that the defendants knew better than to make the medical decisions that they

did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused.

We now turn our attention to Petties's claims against his doctors.

### A. Material Factual Dispute Exists as to Whether Dr. Carter Was Deliberately Indifferent

Petties's principal claims against Dr. Carter are that he acted with deliberate indifference to his injury when he failed to immobilize Petties's ruptured tendon for six weeks, delayed Petties's appointment with a specialist, and refused to order surgery to repair the tendon.[3]

Dr. Carter's deposition, as well as Stateville's medical records, confirm that Dr. Carter's initial diagnosis of Petties's injury was an Achilles tear. Dr. Carter also testified that the appropriate treatment for a complete Achilles rupture is to immobilize the ankle, put it in a non-weight bearing status, and prescribe anti-inflammatory drugs and passive stretching exercises. He explained the purpose of immobilization, stating, "in the acute phase of healing, you are generating an immune system response in the body," and when asked if keeping the tendon in one place enables this healing process to go forward favorably, he replied, "Correct. And if you're continuously injuring it, it hinders that process." He also testified that for

---

[3] We reject the dissent's characterization of Petties's claims against both of his doctors as a challenge to the quality of his medical care. Rather, Petties argued that his doctors' treatment decisions—and their harmful consequences—supported his claim that the defendants deliberately refused to pursue care they knew he needed. Petties has never argued that his doctors' poor care by itself violated the Eighth Amendment.

both partial and complete Achilles ruptures, he would always immobilize the tendon.

Dr. Carter's opinion was consistent with the deposition testimony of Petties's orthopedic specialist, Dr. Puppala, who testified that he would always immobilize a ruptured Achilles tendon, unless the injury had an open sore that needed to be addressed first. It was also consistent with the testimony of Dr. Chmell, the ankle specialist who treated Petties after Dr. Carter had left Stateville. He testified that immobilization is essential to the healing of an Achilles tendon, and that healing without immobilization is "possible but not very likely."[4] And finally, Wexford's own protocol, which Dr. Carter testified he was responsible for implementing, stated that the primary course of treatment for an Achilles rupture included a splint. Dr. Carter also testified he was not aware of any shortage of splints at Stateville during the time that he was treating Petties.

Together, these pieces of circumstantial evidence support a reasonable inference that Dr. Carter knew that failure to immobilize an Achilles rupture would impede Petties's recovery and prolong his pain. It is certainly true that Dr. Carter's decision not to immobilize Petties's ankle could have been an oversight, or a fundamental misunderstanding of the proper course of treatment. Some of his testimony suggests that he believed crutches served the same purpose as a boot. But that testimony conflicts with other parts of his deposition that explained the distinct purpose of immobilization, which is not

---

[4] We are puzzled by the dissent's proposition that the care Petties received did not worsen his condition because his health eventually improved. We do not ascribe to the view that the eventual resolution of a long-ignored medical issue establishes compliance with the Eighth Amendment.

to prevent bearing weight on the injured foot, but to keep the ruptured tendon in one place. It also conflicts with the testimony of the other doctors who treated Petties. A jury could also find suspicious that Dr. Carter did not provide the boot until an outside doctor documented the importance of immobilization in writing. A reasonable inference to draw from this evidence is that Dr. Carter was aware of the need for immobilizing a ruptured tendon, but simply decided not to until he came under scrutiny. Also, a jury could reasonably conclude that Dr. Carter's decision caused substantial harm—Petties's affidavit stated that without a splint, he had nothing to keep his ankle from moving around, which made him feel "constant, severe pain" whenever he got up to walk, and made sleeping difficult.

Besides Dr. Carter's failure to immobilize his foot, Petties also claims that Dr. Carter was responsible for the six-week delay in seeing Dr. Puppala to confirm Petties's diagnosis, which is when he finally received a boot. As an initial matter, Petties has provided corroborating medical evidence that the delay had a detrimental effect on his condition through Dr. Puppala's treatment notes, which indicate Petties was suffering pain and gapping at the rupture site due to the lack of immobilization. This finding is consistent with Petties's own testimony that he was in constant and severe pain while he waited to see a specialist.

Dr. Carter argues that the delay was attributable to prison lock-downs, which barred visits to outside specialists unless he issued an emergency override order which allowed patients to receive emergency care. But immobilization could have alleviated Petties's pain while he waited, so this explana-

tion does not resolve Dr. Carter's testimony that he was unaware of any shortage of splints at Stateville during the six weeks that Petties suffered severe pain while waiting to see Dr. Puppala. It also does not explain why Dr. Carter did not view Petties's situation as an "emergency" as compared with other serious injuries. The harm stemming from the delay in receiving the boot would have been avoided by sending Petties to the emergency room so he could get an MRI. And the harm from the delay in seeing a specialist would have been mitigated by splinting Petties's foot while security issues were resolved. The delay of both, without a clear justification for either, dooms Dr. Carter's argument that Petties's suffering was unavoidable. On this record, whether the delay was the result of negligence or deliberate indifference is a question for the jury to decide.

Finally, Petties argues that Dr. Carter should have followed Dr. Puppala's recommendation to explore surgery as an option. But Petties did not produce medical evidence confirming that he would have benefited from surgery, and when he visited Dr. Chmell in July 2012, his tendon showed signs of improvement. However, Petties's contention that Dr. Carter said surgery would be "too expensive" is a piece of circumstantial evidence that a jury could view as supporting his other claims. If a jury believes that Dr. Carter cited cost as a reason for refusing one form of treatment, then it would be reasonable to infer that Dr. Carter made other medical decisions in Petties's case — failing to splint his foot, not issuing an emergency override order so he could see a specialist — that were dictated by cost, administrative convenience, or both, rather than medical judgment.

Petties has provided sufficient evidence to survive summary judgment on his § 1983 claims against Dr. Carter.

### B. Material Factual Dispute Exists as to Whether Dr. Obaisi Was Deliberately Indifferent

Petties also argues that Dr. Obaisi was deliberately indifferent when he refused to order physical therapy after Dr. Chmell ordered it. Dr. Obaisi responds that Petties did not need a physical therapist because he already knew which exercises to use from a prior Achilles injury. He also argues that Petties could have walked on his injured ankle to strengthen it.

The problem with Dr. Obaisi's arguments is that they are totally at odds with the evidence in this case. He testified that he always follows the advice of specialists, that Petties's specialist recommended physical therapy, and that he did not order physical therapy for Petties. To justify this questionable decision, he states that Petties knew what to do based on prior physical therapy. This is clearly a post-hoc rationalization, because he also testified he did not know whether Petties had previously undergone physical therapy at the time that he decided to refuse him physical therapy. And finally, his contention that walking on an injury is the equivalent of physical therapy is unsupported by any medical evidence, and strains even a lay person's understanding of how to treat an injury. Professional judgment is needed to determine whether, when and how much exertion will heal rather than aggravate the injury. And a reasonable jury could find leaving a patient to make this determination by himself carried an impermissible and unjustifiable risk of pain and prolonged recovery. At the very least, Petties has the right for a jury to hear Dr. Obaisi's justifications for his treatment decisions (or lack thereof) and

to determine if Dr. Obaisi was deliberately indifferent, rather than simply incompetent, in treating his injury.

### C. Qualified Immunity Inappropriate at Summary Judgment Stage

While the district court did not reach the issue, in the proceedings below, the defendants pursued the additional argument that they were entitled to qualified immunity. But even if the defendants preserved this argument, qualified immunity does not apply to private medical personnel in prisons. *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 794 (7th Cir. 2014). Even if the Wexford employees were entitled in theory to qualified immunity, it could not be granted at this point. If a jury finds that Dr. Carter and Dr. Obaisi knew that the course of treatment they were pursuing was inadequate to meet Petties's serious medical needs, such conduct violates clearly established law under the Eighth Amendment. *See Farmer*, 511 U.S. at 837. Given that the threshold factual questions of the defendants' states of mind remain disputed, summary judgment on the basis of qualified immunity is inappropriate. *See DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998).

### III. CONCLUSION

For the foregoing reasons, we REVERSE the district court's grant of summary judgment and REMAND for further proceedings.

EASTERBROOK, *Circuit Judge*, joined by FLAUM and KANNE, *Circuit Judges*, dissenting. My colleagues take it as established that the Constitution entitled Petties to an orthopedic boot, or some other means to immobilize his foot, immediately after his injury. They remand for a trial at which a jury must determine whether the defendants were deliberately indifferent to the pain his ruptured Achilles tendon caused. This approach effectively bypasses one of the two issues that matter to any claim under the Cruel and Unusual Punishments Clause: first there must *be* a cruel and unusual punishment, and only then does it matter whether the defendant acted with the mental state necessary for liability in damages. See, e.g., *Helling v. McKinney*, 509 U.S. 25 (1993). A court should begin with the conduct issue and turn to mental states only if the behavior was objectively cruel and unusual. And *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court's sole decision addressing the question whether palliative medical treatment (pain relief without an effort at cure) violates the Eighth Amendment, holds that palliation suffices even if the care is woefully deficient.

To understand the Supreme Court's conclusion that medical malpractice is a problem under state law rather than the Constitution, it helps to start with the facts of *Estelle*, which may be found in the Fifth Circuit's opinion, *Gamble v. Estelle*, 516 F.2d 937 (5th Cir. 1975), as well as the Supreme Court's. Gamble alleged that a 600-pound bale had fallen on him and injured his back, leaving him in pain so severe that he frequently fainted (his complaint called the episodes "blankouts"). He visited the prison infirmary and received medicine designed to dull the pain. When he said that this did not work, and that the pain and blackouts were continuing, the prison gave him more of the same medicine. When he said that his

pain prevented him from working, he was treated as a shirker and thrown into solitary confinement. Although the prison's medical staff stuck to ineffective medication, it did *nothing* to find out what kind of injury Gamble had suffered and how the problem might be fixed.

The Fifth Circuit ruled that Gamble had established a constitutional claim, because "the State has totally failed to provide *adequate* treatment of [his] condition. Again and again, as the complaint makes clear, the only medication prescribed was to relieve the pain, not to cure the injury; indeed, the exact nature of the back injury remains unknown." 516 F.2d at 941 (emphasis added). The Fifth Circuit thought that the Constitution requires not only palliation but also a medically competent effort to cure, starting with an x-ray, a diagnostic procedure that the prison had not employed.

The reader of today's majority opinion would suppose that the Supreme Court affirmed the Fifth Circuit's demand for competent care. But that's not what happened. The Supreme Court reversed and held that palliation satisfies the Constitution, even if the prison's medical staff does not try to determine how pain is being caused and what might be done to cure it. That some care was given was enough. The Justices said that deliberate indifference to a prisoner's pain violates the Constitution if it leads the staff to do nothing, but that medical care meets the constitutional standard. Gamble received care. He received *wretched* care, but the Court held that a claim based on deficient care depends on state medical-malpractice law. 429 U.S. at 107 & n.15. The Justices disapproved the Fifth Circuit's conclusion that the Constitution entitles prisoners to "adequate" care.

Our initial question therefore ought to be: Did the defend-
ants provide Petties with medical care? That question is easily
answered. Petties concedes that he received medical care—
quite a lot of it. The majority opinion outlines the basics. In
January 2012 Dr. Imhotep Carter correctly diagnosed a rup-
tured Achilles tendon and gave Petties crutches, ice, and Vi-
codin (a pain-reducing drug). He referred Petties to a special-
ist. In March 2012 an MRI exam confirmed Carter's diagnosis.
Dr. Anuj Puppala, an orthopedist, gave Petties an orthopedic
boot to reduce motion of the foot (in relation to the tendon)
when he walked. Carter authorized the use of the boot in the
prison, assigned Petties to a lower bunk, and continued the
ice and drug treatments. In July 2012 Carter referred Petties to
Dr. Samuel Chmell, an ankle specialist who recommended
physical therapy, stretching, and another MRI. After replacing
Carter as Stateville's medical director, Dr. Saleh Obaisi contin-
ued the course of treatment that Petties was receiving, includ-
ing use of the boot. The second MRI, which Obaisi approved,
showed partial healing.

Petties maintains that Carter and Obaisi should have done
more—that Carter should have provided an orthopedic boot
in January 2012 rather than waiting until Petties saw Puppala
in March, and should have authorized surgery; that Obaisi
should have authorized physical therapy in addition to order-
ing another MRI and continuing the treatment already pro-
vided (the boot, the lower bunk, and so on). Nonetheless,
there can be no question that Petties received more, and bet-
ter, medical care than Gamble received. Yet Gamble lost on
the pleadings.

*Estelle* holds that a claim of deficient medical care must
proceed under state law rather than the Constitution. When

the prison provides *no* care for a serious medical condition, that counts as cruel and unusual punishment if the physicians or other responsible actors are deliberately indifferent to the condition. (*Farmer v. Brennan*, 511 U.S. 825 (1994), supplies the Court's definition of "deliberate indifference".) *Estelle* recognized one more potential category: harmful interventions. 429 U.S. at 104 & n.10. But Petties does not contend that the care he received from Carter and Obaisi made his condition worse, compared with no care at all.

Notes 10 and 12 of *Estelle* suggest a potential way to distinguish malpractice from a violation of the Constitution: whether the prison's staff exercised medical judgment. Petties does not pursue this possibility; he does not deny that the defendants exercised medical judgment. Instead he insists that they exercised *bad* medical judgment, leading to inferior care. And *Estelle* holds that a claim of poor care must be classified under the law of medical malpractice. (Petties complains that Carter and Obaisi deemed surgery and rehabilitative therapy too expensive, but asking whether a potential treatment is cost-justified is part of professional judgment. Outside of prisons, solvent patients and their insurers, as well as physicians, routinely consider whether a particular drug or medical procedure is worth the price.)

At least three circuits ask whether the prisoner received some treatment, rather than whether the treatment was inferior (even grossly deficient). See, e.g., *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Durmer v. O'Carroll*, 991 F.2d 64, 68–69 (3d Cir. 1993); *Self v. Crum*, 439 F.3d 1227, 1230–33 (10th Cir. 2006) (discussing other cases in the circuit); *Farmer v. Moritsugu*, 163 F.3d 610, 614–16 (D.C. Cir. 1998). Today's decision is incompatible with the approach of

those circuits, though it has support in decisions of the Ninth Circuit. See, e.g., *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012); *Hamilton v. Endell*, 981 F.2d 1062, 1066–67 (9th Cir. 1992). The First Circuit may have an intra-circuit conflict. Compare *Perry v. Roy*, 782 F.3d 73 (1st Cir. 2015), with *Feeney v. Correctional Medical Services, Inc.*, 464 F.3d 158 (1st Cir. 2006). Still other circuits are hard to classify.

My colleagues say that prisoners are entitled to relief under the Eighth Amendment when prison physicians do not employ "competent medical judgment" (opinion at 8) or "minimally competent medical judgment" (*id.* at 9). That tracks state tort law and is incompatible with *Estelle*. Other phrases in the opinion, such as "professional judgment" (*id.* at 10 and 17) and "reasonable medical judgment" (*id.* at 10) also seem to be proxies for the law of medical malpractice and equally at odds with *Estelle*.

And if we were authorized to find a "competent medical judgment" standard in the Constitution, why should we *want* to federalize the law of medical malpractice? Prisoners such as Petties have a tort remedy under state law. Carter and Obaisi were employed by Wexford rather than the state. They owe prisoners the same duties as any physician owes to private patients and are subject to the same remedies under Illinois law. See *Jinkins v. Lee*, 209 Ill. 2d 320, 336 (2004). Even physicians employed by the state are subject to the normal rules of tort law. See 745 ILCS 10/6-106(d); *Moss v. Miller*, 254 Ill. App. 3d 174, 181–82 (1993). When prison physicians are employed by the state, inmates have an extra remedy by suit against the state itself, see 745 ILCS 5/1; 705 ILCS 505/8(d), just as inmates injured by medical malpractice in federal prisons can use the Federal Tort Claims Act. Perhaps prisoners hope

that constitutional claims will produce awards of attorneys' fees under 42 U.S.C. §1988(b), while Illinois requires plaintiffs to bear their own fees, but §1988 is not a good reason to constitutionalize tort law. And federal law comes with complications, such as qualified immunity and the deliberate-indifference standard, missing from state law. *Estelle* told the courts of appeals to relegate bad-treatment situations to state law, and we should carry out its approach.