In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-3310

ARRON MURPHY,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES INC.
and DR. VIPIN SHAH,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 18-CV-01077-JPG-MAB — **J. Phil Gilbert**, *Judge.*

ARGUED JUNE 9, 2020 — DECIDED JUNE 18, 2020

Before KANNE, SYKES, and BRENNAN, *Circuit Judges.*

PER CURIAM. Arron Murphy, a former Illinois prisoner, appeals the district court's entry of summary judgment in favor of the defendants in his suit asserting their deliberate indifference to his dental infection. Murphy's infection—which swelled on his face to the size of a softball—ultimately required multiple surgeries. Relying on expert testimony,

Murphy argues that fact questions exist concerning the prison doctor's choice of medicine and subsequent delay in sending him to a hospital. The district court correctly concluded that the record reflects not deliberate indifference but at most a medical disagreement over the course of treatment, so we affirm the judgment.

## I. BACKGROUND

Because this case was decided at summary judgment, the following facts are set forth in the light most favorable to Murphy. *See Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016) (en banc).

### A. Dental Infection and Medical Treatment

On May 4, 2016, a dentist extracted one of Murphy's teeth, a molar in his upper-left jaw.

Two days later, a Friday, Murphy went to the prison's healthcare unit, complaining that his left cheek had swollen significantly. Derek Rice, a prison nurse who examined Murphy, described the swelling as "softball-size[d]" and suspected an infection. (Doc. 44–7 at 1; Doc. 44–6 at 15:12–16:4.) Rice spoke in person with Dr. Shah about the evaluation.[1] Dr. Shah prescribed penicillin, one gram by mouth twice a day for five days, because it is "one of the most commonly chosen drugs by M.D.s for dental infection[s]." (Doc. 44–6 at 13:15–23; Doc. 44–1 at 20:23–21:18.) Treatment records reflect that Murphy received penicillin that morning. Murphy contends that he received only one dose of the medicine, but a notation in the record alongside a reference to the lone disbursement

---

[1] Neither Dr. Shah nor Nurse Rice recalled these events. They based their testimony on review of the medical records.

says "#10 doses." (Doc. 46–1 at 2.) Dr. Shah, who did not examine Murphy that day, did not recall whether Rice told him of the extent of Murphy's swelling.

The next day, Saturday, May 7, Murphy had to make several trips to the healthcare unit. At 1:00 a.m., Murphy complained that he was having difficulty swallowing. The nurse told him that, at that hour, she was "definitely not calling the doctor," but he should ice his jaw and neck and come back later in the morning. (Doc. 46–4 at 34:8–13; Doc. 44–7 at 3.) Murphy returned at 9:00 a.m., noting that his tongue felt swollen; however, he was unable to open his mouth wide enough for the nurse to see it. Thinking his condition was an allergic reaction, the nurse gave him Benadryl. The nurse was unable by phone to reach Dr. Shah (who did not work at the prison on weekends) and told Murphy to return at 2:00 p.m. to be reassessed—but to return "ASAP" if he had any shortness of breath. (Doc. 44–7 at 6–7; Doc. 44–1 at 7:7–10.) Shortly after, the nurse spoke with Dr. Shah and told him that Murphy's swelling was worse than the day before. Dr. Shah was not concerned that the antibiotic was not working because penicillin takes several days to work. Dr. Shah did, however, prescribe a steroid by injection because, in his experience, the steroid "has always helped the bacteria to subside more along with the antibiotic." (Doc. 44–7 at 7; Doc. 44–1 at 36:13–38:5.)

Two days later, a Monday, Dr. Shah examined Murphy for the first time, and noted that, in addition to the swelling, he was having difficulty closing his mouth and swallowing. Dr. Shah placed Murphy under a 23-hour[2] "infirmary

---

[2] The "23-hour" figure appears to be the relevant duration of the prison healthcare unit's standard order for determining treatment plans.

observation," with his vital signs to be checked every four hours, to see if the treatment was helping, and he ordered another steroid injection. (Doc. 44–1 at 38:24–40:16.) But Dr. Shah didn't believe Murphy's condition had worsened because he did not have a high temperature (which would signal infection) or respiratory difficulty (which would suggest spread of infection). Over the course of the day, Murphy's swelling persisted, and his temperature fluctuated between 98.5 and 99.8 degrees.

Dr. Shah saw Murphy again the next morning, May 10, and noted continued swelling. At the site of the tooth extraction, the doctor noticed grayish discoloration, which indicated infection, and so he admitted Murphy to the infirmary out of concern that the infection was not healing. He gave Murphy an injection of a different antibiotic, thinking that it may work faster than penicillin, and another steroid injection. Later in the day, Murphy reported having chills; his temperature had spiked to 105 degrees. Dr. Shah prescribed Tylenol and ibuprofen, which helped reduce Murphy's temperature that night.

Just before noon on May 11, after two check-ups that morning, the nurse noticed faint whistling when Murphy breathed. The nurse notified Dr. Shah, who wasn't working at the prison that day, and the doctor ordered that Murphy be sent to a local hospital's emergency room.

After a CT scan showed signs of an infection and the closing of Murphy's airway, emergency-room staff transferred him to another hospital. There, Dr. Jonathan Bailey, an oral and maxillofacial surgeon, diagnosed him with Ludwig's angina—a disease that involves infections of nearly all the anatomic spaces in the neck and requires urgent surgical

treatment. That day, Dr. Bailey operated on Murphy, draining the involved spaces of fluid.

Later that week, Murphy underwent two more surgeries to clean the incisions and drain the spaces again. He returned to the prison on May 31.

### B. District Court Proceedings

Murphy then sued Dr. Shah for deliberate indifference. (This appeal does not concern Murphy's claims against Dr. Shah's employer, Wexford Health Sources, Inc., or his state-law claims against both defendants, so we say nothing further about those claims.)

Dr. Shah moved for summary judgment, arguing that Murphy raised only a disagreement with his treatment, which is insufficient to show that Dr. Shah actually knew of and disregarded a substantial risk of harm. Dr. Shah enlisted the support of two experts, a dentist and an oral and maxillofacial surgeon, who both opined that Dr. Shah's treatment of Murphy was within the standard of care and did not show that Dr. Shah disregarded his medical condition.

Murphy countered that genuine issues of material fact regarding Dr. Shah's treatment precluded summary judgment. In addition to questions about the use of penicillin and steroids, Murphy argued that Dr. Shah recklessly disregarded the serious risk to his health by refusing to send him to the hospital before May 11. Murphy relied on his expert, Dr. Robert Citronberg, a physician certified in infectious medicine, who opined that Dr. Shah "ignored the obvious risk of progression [to] the severe infection that [Murphy] ultimately suffered." (Doc. 46 at 17, quoting Doc. 46–3 at 3.)

Largely adopting the report and recommendation of a magistrate judge, the district judge granted Dr. Shah's motion, finding that the case amounted to only a disagreement over the proper course of treatment. The district judge acknowledged Dr. Citronberg's disagreement with Dr. Shah's choice of treatment, but highlighted Dr. Citronberg's testimony that Dr. Shah provided "what he thought was the right treatment" and did not "wholly disregard" Murphy's condition. (Murphy's Br. App. at 19, quoting Doc. 44-2 at 10:1–11.) Nor was there any genuine dispute, the judge added, that Dr. Shah had acted within the bounds of professional judgment by choosing to wait until May 11 (five days after Murphy first went to the prison clinic) to send Murphy to the hospital. Noting that penicillin often takes several days to take effect, the judge concluded that no reasonable factfinder could determine that Dr. Shah was "persisting in a course of treatment that was *known* to be ineffective." (Murphy's Br. App. at 23.)

## II. ANALYSIS

On appeal Murphy first argues that, contrary to the district judge's determination, a reasonable jury could find that Dr. Shah was aware of his condition, recklessly disregarded its progression, and improperly delayed sending him to the hospital. He points to the testimony of his expert, Dr. Citronberg, and his treating surgeon, Dr. Bailey—expert testimony that, he believes, the district court wrongly "discount[ed]" in favor of its own view of the record. (Murphy's Br. at 23.)

Deliberate indifference requires a two-fold showing. First, the plaintiff must suffer from an "objectively serious medical condition." *Petties*, 836 F.3d at 727–28 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The parties agree that Murphy's dental infection meets this requirement. But second, the

plaintiff must provide evidence that the defendant "*actually* knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728.

The assessment here presents a close question. On the one hand, Dr. Citronberg's report does contain statements that, in isolation, may call into question whether the risk of severe infection posed to Murphy was so obvious that a reasonable jury could infer that Dr. Shah was aware of the risk and disregarded it. *See Petties*, 835 F.3d at 729. For instance, Dr. Citronberg opined that Dr. Shah "ignored the obvious risk of progression to the severe infection that [Murphy] ultimately suffered." (Doc. 46–3 at 3.) This progression, he said, was "apparent" from the softball-sized swelling to Murphy's cheek that persisted despite treatment, and the presence of new swelling that had developed in his mouth and to his jaw. (Doc 46–3 at 2–3.) And this progression, he added, required a transfer to a higher level of care, which Dr. Shah did not order until days later.

But portions of Dr. Citronberg's sworn testimony require understanding these statements about shortcomings in Dr. Shah's medical care as a difference in medical opinion about the proper course of treatment. As the district court noted, Dr. Citronberg testified that, while he disagreed with Dr. Shah's course of treatment, Dr. Shah provided "what he *thought* was the right treatment." (emphasis ours). (Murphy's Br. App. at 19, quoting Doc. 44–2 at 10:1–4.) And Dr. Citronberg agreed that Murphy's condition remained "generally the same" during the five days from his arrival at the prison healthcare unit on May 6 until he showed his first signs of a high fever on May 10. (Doc. 44–2 at 52:1–53:15.)

Murphy responds that the district court took Dr. Citronberg's testimony out of context and that a factfinder still could find deliberate indifference. He spotlights Dr. Citronberg's statement that his condition between May 6 and May 10 "was *always* severe enough to require transfer to a hospital." (Murphy's Reply Br. at 9.) But this statement does not relate to Dr. Shah's subjective awareness of a substantial risk, let alone the risk of *progression* to a severe infection. The statement reflects merely a difference of opinion over when Murphy should have been sent to a hospital, a scenario that is insufficient to support deliberate indifference. *See Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim."); *see also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996).

Murphy also argues that deliberate indifference can be inferred from the testimony of his treating surgeon, Dr. Bailey, who said that when a patient shows signs of trismus (reduced opening of the jaws) and infection, "[y]ou need to get imaging to find out what's going on." (Murphy's Br. at 23, 25–26; Doc. 44–5 at 75:22–76:4.) But a failure to seek a particular diagnostic technique, like imaging, "is a classic example of a matter for medical judgment," amounting to, "[a]t most," medical malpractice, *Estelle v. Gamble*, 429 U.S. 97, 107 (1976), which "just isn't enough," *Steele*, 82 F.3d at 179. What's more, Dr. Bailey's testimony says nothing about Dr. Shah's actual knowledge of a need to order such imaging.

Relatedly, Murphy argues that deliberate indifference could be inferred from Dr. Shah's failure to alter the antibiotic treatment upon learning that he was not taking his oral penicillin. In support, Murphy references his increased swelling

and inability to open his mouth as of May 7, and entries in a prison medical record (to which Dr. Shah likely had access) that, he says, show he received only the first of five prescribed doses.

But there is no evidence that Dr. Shah knew that Murphy was not taking the medicine. The doctor testified that he was not concerned with Murphy's symptoms on May 7 because penicillin, which had been started only the previous day, takes 4–5 days to heal an infection. But Dr. Shah also did more than stick with the same penicillin treatment; on May 10 he gave Murphy an injection of a different antibiotic because it "works faster." (Doc. 44–1 at 50:13–18.) And even if Murphy's prison medical record reflects that he received only one dose of penicillin,[3] it is unreasonable to infer, without more, that the particular record was both in the chart Dr. Shah reviewed and that he saw it.

Finally, Murphy turns his attention to Dr. Shah's steroid treatment, which, Murphy says, showed a "complete abandonment of medical judgment"—as opined by Dr. Citronberg. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). But Dr. Citronberg's written opinions and oral testimony do not go so far; his statements suggest only that Dr. Shah's steroid treatment can be regarded as negligent. As he wrote in his

---

[3] Such an assumption probably would be misplaced (even though the magistrate judge agreed with Murphy on this point). Nurse Rice testified that for an oral penicillin prescription (as opposed to injection), he typically would issue all doses of the medication to the inmate to keep in his cell and take as directed. That testimony is consistent with Murphy's prison medical record, which bears a set of initials alongside an entry for May 6 at 8:00 a.m. with a notation "#10 doses" (*i.e.*, 2 pills per day for 5 days). (Doc. 46–1 at 2.)

report, the use of steroids outside of an appropriate hospital setting and without appropriate antibiotics was a "deviation from the standard of care." (Doc. 46–3 at 3.) His oral testimony was similar: Steroid treatment in this situation was "inappropriate," though he acknowledged that certain antibiotics and steroids are a "known treatment" for oral infections in "certain situations." (Doc. 44–2 at 40:4–13; 41:5–42:1.) The matter of steroid treatment, then, merely highlights a difference in medical opinion over the course of treatment—a standard that suggests negligence rather than deliberate indifference. *See Petties*, 836 F.3d at 729.

### III. CONCLUSION

Because the evidence would not support a finding of deliberate indifference, we AFFIRM the judgment.