**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted May 24, 2021[*]
Decided May 28, 2021

**Before**

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

THOMAS L. KIRSCH II, *Circuit Judge*

No. 19-2785

| | |
|---|---|
| CRAIG CESAL, | Appeal from the United States District |
|    *Plaintiff-Appellant*, | Court for the Southern District of Illinois |
| | |
|    *v.* | No. 16-CV-1064-SMY-RJD |
| | |
| DOUGLAS KRUSE, et al., | Staci M. Yandle, |
|    *Defendants-Appellees*. | *Judge*. |

**O R D E R**

Craig Cesal is a federal inmate with diabetes and back pain. He contends that healthcare workers at FCI Greenville violated the Eighth Amendment by intentionally mistreating these two conditions during his last six months at the prison. Relying on undisputed evidence of the professional aid that Cesal received to address his diabetes and back pain, the district court entered summary judgment for the defendants. On

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

appeal, Cesal argues that bad-faith treatment created a triable issue of fact, but because his argument is not supported by evidence, we affirm.

Regarding diabetes, Cesal contends that trouble began in September 2014 when Greenville discontinued his free, nighttime diabetic snack. Up until then, the prison provided diabetic inmates with a free diabetic snack every evening to help stabilize their blood sugar. Following national guidelines, Greenville's policy changed so that only inmates with a history of hypoglycemic episodes (dangerous drops in blood sugar) were given the snack; others were encouraged to buy healthy food at the commissary to keep on hand. The available menu included unsalted saltine crackers and peanut butter, meat, and cheese—all suggested for people with diabetes. Cesal did not qualify for free snacks because he had no significant hypoglycemic episodes before September 2014.

After the free snacks ended, Cesal reported some minor hypoglycemic incidents at night, which medical staff addressed, determined were unrelated to a lack of night snacks, and resolved. In each instance, tests showed low blood sugar, but he appeared otherwise asymptomatic. After the first incident, a physician's assistant told him that low blood sugar at night was common for people with Type II diabetes like his. She told him that his glucometer had recorded similar occurrences months before the snack was discontinued, and it was best treated by a change in medication. She reduced his dose of glyburide, which can cause hypoglycemia, and replaced it with sliding-scale insulin to be given based on blood-sugar checks. And whenever he had a hypoglycemic episode, he received a free diabetic snack or a form of glucose. Later, when a doctor found that his blood-sugar levels were running high, the doctor planned to adjust the insulin prescription until it was under control.

While medical staff adjusted Cesal's insulin, he sometimes had hyperglycemic incidents (dangerously high blood sugar) before receiving his morning insulin and hypoglycemic incidents afterward, but his doctor hypothesized a likely cause. The doctor reviewed Cesal's commissary purchases and found he had been ordering items high in simple sugars (which can cause extreme swings in blood sugar) such as chocolates, coffee cakes, and maple clusters. He advised Cesal to purchase healthier snacks, such as unsalted crackers and peanut butter.

During a short time in solitary confinement, when Cesal did not have access to sugary commissary items, he consistently had lower blood sugar, but when he regained that access, he had more hyper- and hypoglycemic incidents until he left Greenville. Before his departure, in response to these incidents, medical staff adjusted his medication. Cesal moved to FCI Terre Haute in March 2015, where the staff

significantly increased his daily dose of insulin. Cesal has had no further problems with hyper- or hypoglycemia.

While at Greenville, medical staff also treated Cesal for chronic back pain. At one point, the physician's assistant discontinued his prescription for ibuprofen and offered him Tylenol instead. She gave two reasons. First, she said that lab tests showed that his kidney function was declining, and ibuprofen would make it worse. Second, a search of Cesal's cell turned up over 300 unused ibuprofen tablets. Separately, Cesal's doctor later told him that he did not need prescription pain relievers for his back pain and that he should buy Tylenol from the commissary as needed. The doctor also noted that Cesal's kidney function improved once he stopped taking ibuprofen.

Cesal brought this suit against his medical providers at Greenville under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and it ended at summary judgment. In the district court, Cesal contended that the medical staff was deliberately indifferent to his diabetes by cancelling his free snack in bad faith and intentionally mismanaging his blood sugar levels. He argued also that the staff showed deliberate indifference to his back pain by cancelling his ibuprofen prescription. Cesal unsuccessfully moved the court to appoint an expert to assist him, and the district court later entered summary judgment for the defendants.

On appeal, Cesal challenges the entry of summary judgment. To avoid summary judgment, Cesal needed to provide evidence from which a reasonable jury could conclude that he had an objectively serious medical condition and that the defendants were deliberately indifferent to it. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). The defendants stipulate that Cesal's diabetes and back pain were objectively serious, so the only question is whether Cesal marshaled sufficient evidence that they were deliberately indifferent to these conditions—that is, whether they actually knew of and disregarded a substantial risk of harm. *Id*.

We start with the treatment of Cesal's diabetes and conclude that no evidence suggests that the defendants disregarded a substantial risk of harm. To the contrary, they continually monitored his blood sugar, and they adjusted his medicine in response to his symptoms. In particular, they reduced his dose of a drug that can cause hypoglycemia, adjusted his insulin to reduce hyperglycemia, and advised him to avoid sugary foods from the commissary. When Cesal had no access to those foods, his blood-sugar levels improved. This attention and the results reflect reasonable treatment.

Cesal offers three responses, but none is sufficient to reverse the judgment. First, he argues that the staff acted in bad faith and for secret motives, but he offers only speculation and conjecture, which is insufficient. *See Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Second, he argues that his treatment at Greenville did not control his diabetes—only his treatment at Terre Haute worked—so Greenville's staff was deliberately indifferent. But his diabetes was managed well at Greenville before September 2014, and in his last six months there it improved when he avoided sugary items from the commissary. Moreover, evidence that at Terre Haute "some medical professionals would have chosen a different course of treatment is insufficient" to show indifference, *Petties*, 836 F.3d at 729, because no evidence suggests that Greenville's staff recklessly ignored him. Third, Cesal objects to the cancelled, free nightly snacks, but the medical staff was following national guidelines, and they advised him that he could buy his own healthy snacks. He replies that no healthy snacks were available, but the menu shows that he could have bought unsalted crackers, peanut butter, meat, or cheese. Also, he received a free, diabetic snack or a form of glucose when he reported a hypoglycemic episode, again demonstrating that the staff at Greenville tried to treat his medical needs.

We also affirm the judgment regarding the treatment for Cesal's chronic back pain. Cesal argues that the physician's assistant discontinued his ibuprofen prescription in retaliation for waking her up at night to treat a hypoglycemic episode. But he provides no evidence for this assertion and no direct evidence to refute the two reasons she gave: that ibuprofen was damaging his kidneys and that he had hoarded hundreds of ibuprofen pills in his cell. Cesal responds that the physician's assistant had previously seen the same lab results about his kidneys but had not then cancelled his prescription. But this was before she learned about the hoarded pills—a fact that Cesal does not address and which by itself reasonably justifies her decision. We thus see no evidence from which a jury could find that she cancelled his prescription in order to harm him.

We affirm on this count for another reason, too: Cesal provided no evidence that Tylenol, as an alternative to ibuprofen, was insufficient to treat his pain. If Cesal was not harmed by the switch (and there is no evidence that he was) a jury could not find that medical staff "disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. In fact, his doctor (who had no part in deciding to cancel his ibuprofen) later opined that no prescription pain medicine was needed to treat his back pain on a regular basis and that he could purchase Tylenol from the commissary as needed.

Finally, we address Cesal's motion for the court to appoint an expert. We review such a decision for abuse of discretion. *Ledford v. Sullivan*, 105 F.3d 354, 358 (7th Cir. 1997). The issue before the court was whether the defendants were *deliberately* indifferent to Cesal's medical needs; as Cesal presents his claims, it was a question of motive—alleged bad faith, secret motives, and retaliation. We have said that such a claim usually will not require an expert, *id.*, and it did not require one here.

AFFIRMED