NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted September 2, 2021[*]
Decided September 7, 2021

*Before*

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 20-2475

| | |
|---|---|
| HENRY BARROWS, *Plaintiff-Appellant,* | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 3:17-CV-1388-NJR |
| LISA GOLDMAN, et al., *Defendants-Appellees.* | Nancy J. Rosenstengel, *Chief Judge.* |

**O R D E R**

Henry Barrows, an inmate at Menard Correctional Center in Illinois, twice cut himself after telling prison staff of his urges to self-harm. Barrows sued the prison's nurses and mental health staff for disregarding his serious medical needs, in violation

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

of his rights under the Eighth Amendment. The district court eventually entered summary judgment for the defendants. Because Barrows lacked evidence that the defendants acted recklessly or contrary to professional judgment, we affirm.

Barrows has schizoaffective disorder. Nearly two weeks before the incidents in question, he had expressed an intent to commit suicide and was placed on crisis watch. Inmates on crisis watch are monitored either continuously or in short time intervals ranging from 10 to 30 minutes. Dr. Lisa Goldman, Menard's mental-health administrator and a licensed psychologist with experience in high-risk suicide care, placed Barrows on 15-minute crisis watch. The next day, after telling a clinician that he was going to "cut it up" unless he got out of Menard, Barrows squeezed a laceration on his arm, causing blood to spray. He was placed on continuous crisis watch.

The following day, medical staff assessed Barrows as appearing more stable and moved him to 10-minute crisis watch. He remained on that status for several days, until he reopened a preexisting cut on his arm. At Dr. Goldman's direction, he was put in four-point restraints for a brief period. According to medical staff, he became stable over the next few days, and they extended his watch status to 10-minute and then 15-minute intervals.

On September 25, Barrows told Jacob Weatherford, his mental-health counselor, that he wanted to cut himself and needed to be put in four-point restraints. Weatherford responded that Barrows was already on crisis watch and could not be placed in restraints unless he had harmed himself. Weatherford then decided that Barrows should be kept on 15-minute watch. He assessed Barrows at the time as alert, oriented, and cooperative. (In later testimony, he elaborated that Barrows had not specified any plan to harm himself and that inmates on watch were prohibited from possessing dangerous property.) Three hours after Weatherford's assessment, however, Barrows cut his arm in two places—his forearm and his antecubital artery. The cuts, which led to profusive bleeding, were about two millimeters deep and two inches long. Barrows had to be sent to a hospital, where his lacerations were treated.

When Barrows returned that evening to Menard, Amanda Cowan, a mental-health nurse at the prison, evaluated his risk for suicide. Barrows told Cowan that he had cut himself and would continue to do so because he was angry with his "lack of mental health treatment." But he denied being suicidal. Nurse Cowan, who lacked the authority to remove inmates from crisis watch, called Dr. Goldman with her evaluation. Dr. Goldman was aware that Barrows sometimes opened his stitches, but she decided to remove him from crisis watch because he did not report any suicidal ideations. She later

testified that he had not been suicidal for the past three to five days, and she knew that extended time on crisis watch can be detrimental to one's mental health.

Around midnight, after being returned to his cell (in disciplinary segregation), Barrows removed the stitching from one laceration and cut himself again. One cut was about 2.5 inches long and two millimeters deep, and the other was about three inches long and three millimeters deep. Two nurses treated the cuts and closed them with steri-strips. When Barrows refused—in one nurse's words—to "contract for safety," Dr. Goldman had him placed in four-point restraints. His new cut healed within a weak, and the old, reopened cut healed within two months.

Barrows, assisted by recruited counsel, then sued nurses and mental-health staff at the prison for deliberate indifference. He asserted that (1) three of the defendants (Weatherford, Dr. Goldman, and Nurse Cowan) deliberately disregarded his risk of self-harm on September 25, and (2) the two treating nurses willfully closed his wounds with steri-strips instead of referring him for stitches.

The district court later granted the defendants' motion for summary judgment. With regard to Weatherford, Dr. Goldman, and Cowan, the court concluded that no jury could find that they ignored Barrows's mental-health condition or risk of suicide. Their assessment of his mental state may not have been perfect, the court acknowledged, but they appeared "to have done the best they could reasonably have done" based on their observations and professional training. As for the two nurses who applied the steri-strips, the court noted that Barrows's wounds healed quickly, and so Barrows could not point to harm that arose from any lack of physicians' attention. (On appeal Barrows raises no argument about this claim, so we say nothing further about it. *See Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019).)

On appeal, Barrows principally challenges the district court's decision to grant summary judgment on his claims against Weatherford and Dr. Goldman. Beginning with Weatherford, Barrows argues that no reasonable jury could find that the counselor acted any way but recklessly by dismissing his urges to self-harm on September 25 and keeping him on 15-minute supervision. Barrows insists that the nature of his condition at the time required Weatherford to order a higher level of monitoring or place him in restraints.

But no jury could conclude that Weatherford recklessly disregarded Barrows's risk of self-harm. A defendant is not liable under the Eighth Amendment if he responds reasonably to a risk, even if the harm was not avoided. *See Farmer v. Brennan*, 511 U.S.

825, 843 (1994); *Johnson v. Dominguez*, 5 F.4th 818, 824–25 (7th Cir. 2021). The record shows that when Weatherford saw Barrows on September 25, Weatherford assessed him as presenting no imminent risk of self-harm. Weatherford observed Barrows to be alert, clear-headed, and cooperative. Based on those clinical observations, and the fact that Barrows had relayed no specific plan to harm himself, Weatherford determined that he should remain on 15-minute crisis watch. Medical providers are entitled to deference in their decision-making, and Barrows presented no evidence that Weatherford's actions reflected an intentional disregard of any known risks or a substantial departure from accepted professional standards. *See Johnson*, 5 F.4th at 825 (citing cases).

As for his claim against Dr. Goldman, Barrows argues that the district court glossed over key evidence that she recklessly disregarded his risk of self-harm on September 25 when she removed him from crisis watch. Specifically, he points to the surgical procedure that he received a few hours earlier to repair his severed vein, his statement to Nurse Cowan that he planned to injure himself in the same way again, and the unstable nature of his mental-health condition in the preceding weeks.

But no reasonable jury could find that Dr. Goldman departed radically from accepted professional judgment. *See id.* Despite being aware of Barrows's tendency to undo his stitches, she made a reasoned decision to remove him from crisis watch. As set forth in the record, she based her decision on Nurse Cowan's suicide-potential evaluation; Barrows's lack of suicidal ideations; his non-suicidal behavior in recent days; and her awareness that extended time on crisis watch—on which he already had spent two weeks—can harm an inmate's mental health. Even if this assessment were inadequate, the record contains no medical evidence contradicting Dr. Goldman's opinion. *See id.*; *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016). Moreover, nothing in the record suggests that Dr. Goldman was motivated by other factors—such as cost or retaliation—that had nothing to do with medical judgment. *See Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016) (en banc).

Finally, Barrows maintains that Nurse Cowan deliberately ignored his risk of self-harm when she removed him from crisis watch at Dr. Goldman's direction. But Barrows points to no evidence to suggest that Cowan violated any professional standard of care by not second-guessing Dr. Goldman's professional opinion or that she even had the authority to remove Barrows from crisis watch. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 686 (7th Cir. 2012).

AFFIRMED